[No. G040727. Fourth Dist., Div. Three. Jan. 13, 2010.]

PIPEFITTERS LOCAL No. 636 DEFINED BENEFIT PLAN, Plaintiff and Appellant, v.
OAKLEY, INC., et al., Defendants and Respondents.

1544

**COUNSEL**

Coughlin Stoia Geller Rudman & Robbins, Darren J. Robbins, Stephen J. Oddo, Kevin K. Green, Amanda M. Frame; Soltan & Associates and Venus Soltan for Plaintiff and Appellant.

Skadden, Arps, Slate, Meagher & Flom, Eric S. Waxman and Peter B. Morrison for Defendants and Respondents.

**OPINION**

**ARONSON, J.**—A shareholder in a publicly traded company sought substantial attorney fees on the equitable theory of substantial benefit for causing the company to slightly revise a 166-page proxy statement in connection with a proposed acquisition. The shareholder initially sought to enjoin the acquisition, but dropped the lawsuit when the company made some changes to the final proxy statement. The shareholder filed this appeal after the trial court declined to award attorney fees.

We follow the decisions in *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553 [21 Cal.Rptr.3d 331, 101 P.3d 140] (*Graham*) and *Abouab v. City and County of San Francisco* (2006) 141 Cal.App.4th 643 [46 Cal.Rptr.3d 206] (*Abouab*), and hold that the shareholder cannot claim *unjust* enrichment on a catalyst theory where it failed to provide presuit notification to the company. In suing first and asking for changes later, the shareholder failed to comply with an elemental equitable precept: that one who seeks equity must do equity. The attorney fee claim also fails because the shareholder failed to establish an abuse of discretion by showing that the additional language in the proxy statement had an actual and concrete impact on the acquisition vote.

I

FACTUAL AND PROCEDURAL BACKGROUND

Defendant Oakley, Inc. (Oakley), manufactures sport performance sunglasses. In 2007, Oakley announced a proposed sale of Oakley to Luxottica

Group (Luxottica), a worldwide eyewear company, at a sizeable premium above Oakley's average trading price.

Pipefitters Local No. 636 Defined Benefit Plan (plaintiff) is an Oakley shareholder. Less than a week after the announcement, plaintiff filed a stockholder class action lawsuit to enjoin the acquisition as "unlawful and unenforceable." Plaintiff alleged that the directors breached their fiduciary duty by failing to take "all reasonable steps to maximize shareholder value" and by failing to disclose "all material facts concerning the Proposed Acquisition." The trial court sustained Oakley's demurrer to the complaint with leave to amend.

On September 7, 2007, Oakley filed a preliminary proxy statement with the Securities and Exchange Commission (SEC). One week later, on September 14, 2007, plaintiff filed an amended complaint. The amended complaint alleged that the preliminary proxy statement "misstates certain material facts and altogether omits others." It cited the preliminary proxy statement's failure to provide information regarding the following: (1) any actual or potential conflicts between Oakley's board of directors and its financial advisors; (2) Oakley's immediate and future financial prospects; (3) whether there were any other potential bidders; (4) the impact of synergies arising from a combination with Luxottica; and (5) the analysis conducted by Goldman Sachs in connection with the fairness opinion it delivered to the board of directors. Plaintiff continued to seek to enjoin the proposed acquisition.

Oakley demurred to the amended complaint. Oakley argued that the new allegations regarding the "omissions" in the preliminary proxy statement involved a "litany of trivial information that, if included, would . . . serve only to increase the length of an already detailed Proxy."

On October 10, 2007, plaintiff's counsel sent Oakley's board of directors a letter identifying certain information it believed Oakley should include in the proxy. Plaintiff explained that it took this step rather than seek injunctive relief. Oakley agreed to include some of the identified items in "an effort simply to moot Plaintiff's unmeritorious claims" and proceed with the acquisition. Oakley filed its final proxy statement with the SEC on October 17.

Plaintiff never opposed Oakley's demurrer to the first amended complaint, nor did it pursue the litigation or seek to block the acquisition. Oakley's shareholders approved the acquisition on November 7, 2007.

In January 2008, plaintiff instead filed a motion for attorney fees in the range of $325,000 to $375,000 because it "produced a substantial benefit to Oakley shareholders in the form of the disclosure of additional material

information related to the Acquisition." Plaintiff asserted it was entitled to a treble multiplier because of this "novel and complex action."

In opposition, Oakley argued that it only made a "few innocuous changes" to its preliminary proxy "as a tactical matter . . . ." Oakley characterized plaintiff's two complaints as "cookie-cutter" pleadings "containing allegations literally copied from previous complaints filed in similar lawsuits . . . ."[1] To refute plaintiff's claims of "novel" and "difficult" issues, Oakley attached a chart comparing identical "rote allegations" in the amended complaint with identical allegations in other complaints filed by the same attorneys. According to Oakley, "it is hard to dispute the wisdom of choosing not to aggressively pursue a case that should not have been filed in the first instance . . . ."

The court denied the attorney fee motion. At plaintiff's request, the court entered a judgment of dismissal, from which plaintiff has taken this appeal.

II

## DISCUSSION

■ Plaintiff claims it is entitled to attorney fees based on the substantial benefit exception to the American rule that parties bear their own fees. (*Trope v. Katz* (1995) 11 Cal.4th 274, 278–279 [45 Cal.Rptr.2d 241, 902 P.2d 259]; Code Civ. Proc., § 1021.) The substantial benefit exception is a nonstatutory equitable theory, not a legal one. Its principal purpose is to avoid enriching one party whose legal action has substantially benefitted the other. Exercising its equitable discretion, the trial court determines whether the interests of justice require those who received a benefit to contribute to the legal expenses of those who secured the benefit. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 943 [154 Cal.Rptr. 503, 593 P.2d 200] (*Woodland Hills*).)

We independently review any legal issue regarding the appropriate criteria for a fee award. But once those criteria are identified, we defer to the trial court's discretion in determining how they are to be exercised. (*Ramos v.*

---

[1] The amended complaint copied identically worded paragraphs from previous complaints that plaintiff's counsel had filed against other corporations, including InterTrust Technologies Corporation, Inktomi Corporation, Lexar Media, Inc., and Smart & Final, Inc. Indeed, the amended complaint went so far as to include verbatim allegations from an earlier complaint against Gateway Corporation. For example, the complaint spoke of the Goldman Sachs's failure to adequately inform "*Gateway* [*sic*] shareholders [of] the ability to understand how this information contributes to Goldman Sachs' ultimate determination that the Proposed Acquisition was fair." (Italics added.)

*Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 621 [98 Cal.Rptr.2d 388] (*Ramos*).) In fashioning an equitable remedy, the trial court is in the best position to determine whether the criteria for a fee award have been met. We will not disturb its judgment on this issue unless we are convinced the court abused its discretion. (*Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329, 334 [31 Cal.Rptr.3d 599].) A trial court abuses its discretion only where its action is clearly wrong and without reasonable basis. (*Ramos,* at p. 621.)

Our decision to affirm or reverse the judgment below is not constrained by the reasons advanced by the trial court in its ruling or during the hearing on the motion. We will affirm the judgment if the trial court's decision is correct regardless of its explanation. " 'There is perhaps no rule of review more firmly established than the principle that a ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason. If correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion.' " (*Abouab, supra,* 141 Cal.App.4th at p. 661.)

As we discuss below, the trial court properly denied attorney fees under the substantial benefit theory because plaintiff failed to file a presuit notification and failed to establish that it conferred an actual and concrete gain to Oakley shareholders.

A. *The Rationale Underlying the Presuit Notification Requirement Applies to the Substantial Benefit Exception*

Plaintiff did not prevail in its lawsuit against Oakley. Instead, plaintiff dropped the lawsuit while Oakley's demurrer to the first amended complaint was still pending. Because there was no settlement or court judgment, plaintiff's fee claim arises under a catalyst theory, which allows for attorney fees "even when litigation does not result in a judicial resolution if the defendant changes its behavior substantially because of, and in the manner sought by, the litigation." (*Graham, supra,* 34 Cal.4th at p. 560.) The catalyst theory conserves judicial resources by encouraging plaintiffs to discontinue litigation " ' "after receiving through the defendant's acquiescence the remedy initially sought." ' " (*Id.* at p. 573.)

*Graham,* however, interposed a caveat. To discourage nuisance suits brought by attorneys hoping to obtain fees by dropping lawsuits upon obtaining some relatively insignificant relief, *Graham* adopted several "sensible limitations on the catalyst theory . . . ." (*Graham, supra,* 34 Cal.4th at p. 575.) Not only must the lawsuit have some merit but also "the plaintiff must have engaged in a reasonable attempt to settle its dispute with the

defendant prior to litigation." (*Id.* at p. 561.) "Awarding attorney fees for litigation when those rights could have been vindicated by reasonable efforts short of litigation does not advance that objective and encourages lawsuits that are more opportunistic than authentically for the public good. Lengthy prelitigation negotiations are not required, nor is it necessary that the settlement demand be made by counsel, but a plaintiff must at least notify the defendant of its grievances and proposed remedies and give the defendant the opportunity to meet its demands within a reasonable time." (*Id.* at p. 577.)

■ *Graham* arose in the context of an attorney fee claim under the private attorney general doctrine (Code Civ. Proc., § 1021.5.) In *Abouab, supra,* 141 Cal.App.4th 643, the Court of Appeal specifically applied *Graham* to fee claims under the substantial benefit exception. *Abouab* affirmed a trial court's order denying attorney fees to litigants who arguably were the "moving force" for a property tax reassessment following a variety of legal actions which never reached a favorable result. Attorney fees properly were denied because the litigants failed to show presuit notification. "In sum, Petitioners must necessarily attempt to avail themselves of the benefit of the catalyst theory. With the benefit of that theory comes its burden, the requirement of presuit notification, a requirement, we conclude, that applies *regardless of the theory under which one seeks fees.* Petitioners admittedly did not meet that burden. Their claim must fail." (*Abouab, supra,* at p. 669, italics added.)

Plaintiff contends that we should limit *Abouab* to lawsuits against public entities, like the taxing entity in that case. We see no principled reason to make such a distinction. As Oakley points out, "Significantly, the result of not following *Abouab* is that Oakley's shareholders (ironically, the very class whose interests [plaintiff] purport[s] to represent) would suffer economic injury as the company in which they have invested would be forced wastefully to spend money defending against specious claims. Such a result would . . . be inequitable by shifting [plaintiff's] unnecessary and excessive costs and fees to Oakley shareholders."

Alternatively, plaintiff argues that *Abouab* is "just one appellate decision" that we should disregard as being wrongly decided. "To the extent the First District meant to suggest a prenotification requirement for substantial benefit fee awards, *Abouab* should not be followed here." " 'There is no horizontal stare decisis in the California Court of Appeal.' "

■ This is one line that we willingly do not cross. If anything, the rationale for a presuit notification limitation is greater for nonstatutory equitable doctrines like the substantial benefit exception than for the statutory

private attorney general doctrine. As the Supreme Court explained in *Woodland Hills, supra,* 23 Cal.3d at page 943, "Unlike the private attorney general concept, which . . . is intended to promote the vindication of important rights affecting the public interest, the 'substantial benefit' doctrine . . . rests on the principle that those who have been 'unjustly enriched' at another's expense should under some circumstances bear their fair share of the costs entailed in producing the benefits they have obtained." As an equitable tool, "the substantial benefit doctrine rests on the principle of preventing *unjust* enrichment." (*Id.* at p. 945, original italics.) The involuntary beneficiaries should not be saddled "with costs which are out-of-proportion to their perceived benefit." (*Ibid.*)

 Here, plaintiff admits *it waited until nearly four weeks after filing its amended complaint to send a letter to Oakley's board regarding its concerns.* We therefore reject plaintiff's claim that the Oakley shareholders were *unjustly* enriched by the "benefits" it received from plaintiff's lawsuit because plaintiff never made any effort to forward its suggested revisions to management *before* filing its complaint.

Plaintiff argues that *Abouab, supra,* 141 Cal.App.4th 643 should be disapproved in light of the subsequent Supreme Court decision in *Vasquez v. State of California* (2008) 45 Cal.4th 243 [85 Cal.Rptr.3d 466, 195 P.3d 1049] (*Vasquez*). *Vasquez* does not change our analysis. *Vasquez* declined to extend *Graham, supra,* 34 Cal.4th 553 to noncatalyst cases. But for catalyst cases, *Vasquez* left both *Graham* and *Abouab* intact.

 In *Vasquez,* the Supreme Court declined to adopt a categorical presuit notification requirement to attorney fee claims arising in noncatalyst cases which resulted in a judgment or settlement. "To award fees in catalyst cases, we reasoned [in *Graham*], posed a greater risk of rewarding opportunistic litigation than to award fees in cases that end with court-ordered changes in the parties' legal relationships, because a defendant's voluntary decision to change its behavior necessarily raises the question whether the plaintiff's legal work in fact caused the change and thus deserves to be rewarded with fees." (*Vasquez, supra,* 45 Cal.4th at p. 253.) But even for noncatalyst cases, *Vasquez* noted that a court, in considering whether to exercise its equitable powers to award attorney fees, still "properly takes into consideration whether the party seeking fees attempted to resolve the matter without litigation." (*Id.* at p. 251.)

Plaintiff argues we should applaud, rather than criticize, the "collaborative process that plaintiff followed to obtain the additional disclosures . . . ." Under *Graham* and *Abouab,* plaintiff's newfound interest in collaboration was too little and too late. Plaintiff deprived Oakley of the opportunity to add

the requested disclosures to its shareholder communications without either party incurring litigation expenses that ultimately are borne by the shareholders. Since delay defeats equity, we will hold our applause.

**B.** *Plaintiff Has Not Demonstrated an Abuse of Discretion in Determining Plaintiff's Lawsuit Failed to Meet the Criteria for Equitable Fee Shifting*

"A lion produced a mouse." (*Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 318 [103 Cal.Rptr.2d 339] [plaintiff sought "hundreds of thousands of dollars" in a seven-week jury trial that resulted in an award of $3,380 in compensatory and $1,000 in punitive damages].) Separate and apart from the lack of presuit notification, we affirm the trial court's order based on plaintiff's failure to establish that the new material included in the proxy report warranted equitable fee shifting under the substantial benefit doctrine. Plaintiff's victory was "pyrrhic in every respect save the potential of the fee request." (*Ibid.*)

As an equitable theory, the substantial benefit doctrine does not require a fee award merely because the litigation produced some change, however ephemeral or peripheral. Unless there are actual and concrete litigation benefits, the supposed beneficiaries (who are called upon to pay the attorney fees) "may legitimately complain that they should not be involuntarily saddled with costs which are out-of-proportion to their perceived benefit. In such circumstances, insofar as an award of attorney fees is sought to be justified on notions of unjust enrichment, the justification fails." (*Woodland Hills, supra*, 23 Cal.3d at p. 945.)

In *Braude v. Automobile Club of Southern Cal.* (1986) 178 Cal.App.3d 994 [223 Cal.Rptr. 914] (*Braude*), several automobile club members sought attorney fees under the substantial benefit exception when the club revised its bylaws to permit outside candidates (aside from management nominees) to seek election to its board of directors. The members argued that these changes directly resulted from litigation they prosecuted.

*Braude* affirmed the trial court's order denying fees on a substantial benefit theory because the lawsuit did not confer any actual and concrete benefits. "[W]hile the benefit can be pecuniary or nonpecuniary it must be actual and concrete and not conceptual or doctrinal and not merely the effectuation of a constitutional or statutory policy." (*Braude, supra*, 178 Cal.App.3d at p. 1006.) "However, whether opening up the opportunity to participate in the election process will result in actual or concrete benefits to the Club remains a matter of speculation. [¶] . . . [¶] . . . 'The preponderance of evidence suggests that the great majority of the members have little or no interest in its

corporate affairs. The rights vindicated by this suit are apparently of little importance to the members.' " (*Id.* at p. 1009.)

Plaintiff claims to have secured a substantial benefit to Oakley shareholders by providing them with a brief chart summarizing financial projections for Oakley's performance, including net sales, and net income for a five-year period 2007 to 2011. Oakley had provided these projections to Luxottica and Goldman Sachs, but had not included them in the preliminary proxy statement. It is here, plaintiff's counsel asserted at oral argument, where the "rubber meets the road."

Plaintiff's platitude runs flat. As Oakley pointed out, the proxy statement included detailed financial projections for the calendar years 2007 and 2008. The trial court had ample cause to conclude, from the financial information provided in the preliminary proxy statement, that the shareholders already had substantial data regarding Oakley's estimated earnings, including management's projected growth rates for net sales and projected operating income margins.

Plaintiff places inordinate weight upon its role in securing the inclusion of Oakley's projections for the out years like 2010 and 2011. These projections were made before the global financial crisis, when analysts donned rose-colored glasses to make their forecasts. Events following the collapse of Lehman Brothers and the bursting of the United States housing bubble have shown the unreliability of long-term projections. The economic crisis demonstrates that financial predictions of future performance can be wildly flawed. Plaintiff therefore fails to show the 2010 and 2011 projections produced a real and substantial benefit.

None of plaintiff's other claims of benefit to Oakley gains any traction. None made its way to the six-page single-spaced summary term sheet. Besides the expanded profit projections for out years like 2010 and 2011, here are the four other disclosures that Oakley included in the disclosure statement following plaintiff's counsel's letter of October 10, 2007:

(1) "The Board of Directors was aware of management's views as to potential synergies to be realized by Luxottica from the proposed transaction."

(2) "[N]o other person expressed any interest in acquiring all or a substantial part of Oakley's operations in the year preceding the Board's adoption of the merger agreement."

(3) "The investment banking division of Goldman Sachs has not had any material engagements with Oakley or any of its affiliates within the past two years for which it has received fees for services."

(4) An additional description (we do not believe it can be fairly characterized as an explanation) of how Goldman Sachs, Oakley's investment advisor, selected the discount rates and terminal multiplier in its "illustrative discounted cash flow analyses," and how it performed an "illustrative recapitalization analysis."[2]

The parties devote considerable efforts to briefing whether the five additional changes to the Oakley proxy statement provided material information to Oakley under Delaware corporations law, a standard which plaintiff loosely interprets as merely requiring whether "shareholders would view the information as having some value or importance." Not surprisingly, Oakley disagrees with this characterization: "Merely identifying purportedly omitted facts that 'might be helpful' to Oakley's stockholders is insufficient [under Delaware law]."

This discussion, however useful in other contexts, is not determinative for purposes of the California doctrine of equitable fee shifting. As we have noted, under the substantial benefit exception, we look to whether the litigation conferred "actual and concrete" benefits to Oakley shareholders. (*Braude, supra*, 178 Cal.App.3d at p. 1006.)

Indeed, to establish an abuse of discretion, plaintiff must show that disclosure of the additional information was of sufficient import to serve as a tipping point for a reasonable investor's decisionmaking process. Was there a substantial likelihood that the newly disclosed information would cause a reasonable investor to behave differently, such as by changing his or her vote? Confirming or reinforcing a previously determined course of action does not appear to us to require interfering with the trial court's equitable discretion under a substantial benefit theory.

The trial court did not abuse its discretion in declining to award attorney fees based on these five relatively minor changes to Oakley's already lengthy proxy statement. We cannot say these additional disclosures significantly

---

[2] The new language provided: "In conducting the illustrative discounted cash flow analyses, Goldman Sachs used a range of discount rates derived by utilizing a weighted average cost of capital analysis. The applied discount rates were based upon Goldman Sachs' judgment of an illustrative range based upon the above analysis. In order to calculate terminal values, Goldman Sachs selected exit multiples based on a review of the Company's historical latest twelve month EBITDA multiples and the latest twelve month EBITDA multiples of selected companies which exhibited similar business characteristics to the Company or one of its business units." And again: "Goldman Sachs performed an illustrative recapitalization analysis to illustrate to the Board the implied effect on the Company's 2008 and 2009 earnings per share resulting from a debt-financed repurchase by Oakley of a portion of its outstanding common stock at a price of $29.30 per share reflecting the same cash consideration that would be delivered to Oakley's shareholders in the merger."

altered the total mix of information available to Oakley shareholders who were called upon to vote upon the acquisition. Many of them deal with the absence of information or the lack of conflicts. Others merely provide further background or explanatory data regarding the investment bank's analysis.

The preliminary proxy contained an eight-page single-spaced detailed description of Goldman Sachs's work. The arcane descriptions of the illustrative discounted cash flow analyses and illustrative recapitalization analysis (see fn. 2, *ante*) may have added density to the proxy statement, but they did not contribute to clarity. They cannot serve as a basis for granting fees when a fair summary already had been disclosed.

The tangential changes arguably achieved during the instant litigation are reminiscent of those in *Baxter v. Salutary Sportsclubs, Inc.* (2004) 122 Cal.App.4th 941, 942 [19 Cal.Rptr.3d 317] (*Baxter*), where the appellate court affirmed an order denying an attorney fee award because of the "modest relief" obtained. In *Baxter*, a health club modified its preprinted membership contract after a plaintiff filed a lawsuit alleging various statutory violations of California health studio contracts law. Among other shortcomings, the contract failed to inform customers that they had a right to cancel the contract within three *business* days, rather than three calendar days, and it failed to include the company's name and address on the first page. The contract also failed to inform customers that they need not use specific words to cancel their contracts.

On appeal, *Baxter* affirmed the trial court's determination that the lawsuit provided no significant benefit because it involved "minor deficiencies" and a "minuscule benefit." (*Baxter, supra,* 122 Cal.App.4th at pp. 947, 948.) "[W]hile [plaintiff] may have had the right to bring this action, and prevailed in establishing that [defendant]'s contracts were not in full compliance with all statutory requirements, it does not follow as a matter of law that this litigation has conferred a significant benefit on anyone . . . and the record reflects that as a matter of fact it did not." (*Id.* at p. 947.)

Under these circumstances, the trial court, exercising its equitable discretion, justifiably construed the five additional disclosures in the Oakley proxy statement as the result of Oakley's tactical decision to put the lawsuit behind it and move on with the vote on the pending acquisition. As *Graham* recognized, the trial court could reasonably determine that the lawsuit achieved the resulting five modifications to the final proxy statement " ' "by dint of nuisance and threat of expense." ' " (*Graham, supra,* 34 Cal.4th at p. 575.)

## III

### DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

Bedsworth, Acting P. J., and Ikola, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 28, 2010, S180449.